UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Naturaland Trust, South Carolina Trout Unlimited, and Upstate Forever, | ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) | **COMPLAINT** |
| vs. | ) ) | |
| Dakota Finance, LLC dba Arabella Farm, Ken Smith, Sharon Smith, and Willard R. Lamneck, Jr., | ) ) ) ) | |
| Defendants. | ) ) ) | |

Plaintiffs Naturaland Trust, South Carolina Trout Unlimited, and Upstate Forever, by way of their Complaint, would respectfully show unto this Honorable Court the following:

**JURISDICTION AND VENUE**

1.    This Court has subject matter jurisdiction over this case pursuant to 33 U.S.C. § 1365 and 28 U.S.C. § 1331, as this action includes claims under federal law to enforce provisions of the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq.

2.    On November 14, 2019, Plaintiffs notified Defendants of their intention to file suit for violations of the Clean Water Act, in compliance with the statutory notice requirements set forth in 33 U.S.C. § 1365(a)(1). A copy of that notice letter is attached as Exhibit A.

3.    More than 60 days have elapsed since Plaintiffs served the notice letter on Defendants pursuant to the CWA, during which time no competent regulatory agency has commenced and diligently prosecuted an action to redress the CWA violations alleged herein. 33 U.S.C. § 1365(b)(1)(B).

4.     In addition to claims under the Clean Water Act, this action includes closely related state law claims arising out of the same alleged conduct by the Defendants. This Court therefore has supplemental subject matter jurisdiction over these state law claims pursuant to 28 U.S.C. § 1367.

5.     Pursuant to 33 U.S.C. §1365(c), the proper venue for citizen suits under the Clean Water Act is the Federal District Court for the district where the alleged unlawful discharge source is located. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the construction site where unlawful discharges have originated is located in Pickens County, South Carolina.

## PARTIES

6.     Naturaland Trust is a land trust organized under Section 501(c)(3) of the Internal Revenue Code and focused on protection of South Carolina's Blue Ridge Mountains and special places in the Piedmont of South Carolina. One of Naturaland Trust's objectives is to protect critical land linkages that ensure the watersheds, woodlands, and unique ecoregions of the Upstate will remain in their natural state and open to public use. The organization's work includes, among many other things, protecting land surrounding the Cherokee Foothills National Scenic Byway. The Byway, also known as Highway 11, creates a corridor framing some of South Carolina's most treasured natural assets and also crosses or is in close proximity to waterways that are water sources for trout streams and for Lake Keowee.

7.     For over 40 years, Naturaland Trust has played a key and direct role in conserving and protecting over 100,000 acres now in the public domain, including Stumphouse Mountain and Oconee Town in Oconee County, the Nine Times Forest and lands along Highway 11 in Pickens County, the Jocassee Gorges, Raven Cliff Falls, and Caesars Head, Jones Gap, Paris Mountain, Keowee, and Wildcat Wayside State Parks. Naturaland Trust currently owns and manages

approximately 7,000 of these acres, all of which are open to the public. Naturaland Trust's holdings include two properties, totaling 156 acres, bordering the Defendants' properties at issue in this action ("the affected properties").

8.     Upstate Forever is a non-profit conservation organization organized under Section 501(c)(3) of the Internal Revenue Code and focused on protection of critical lands, waters, and the unique character of the Upstate of South Carolina. The organization focuses its work on the ten counties of Abbeville, Anderson, Cherokee, Greenville, Greenwood, Laurens, Oconee, Pickens, Spartanburg and Union. Upstate Forever works to protect the region's most important environmentally sensitive lands and assets in regards to water and habitat quality, and a priority of this work is protection of resources within the southern Blue Ridge escarpment, where the Arabella Farm site is situated.

9.     Upstate Forever is committed to ensuring that Upstate communities are vibrant and retain their natural areas, outdoor heritage, and unique identities in the face of development and sprawl. One manner in which Upstate Forever pursues this objective is through its operation of a nationally certified land trust program. Upstate Forever is party to 124 conservation agreements that protect more than 23,500 acres of critical lands in the Upstate. A conservation agreement, or conservation easement, is a contract between a landowner and a qualified land trust, which allows the landowner to legally restrict certain undesirable land uses and preserve environmental quality.

10.     Upstate Forever holds a conservation easement on the Naturaland Trust properties that have been affected by Defendants' development activities. Upstate Forever and Naturaland Trust have entered a contractual easement agreement in relation to the affected properties, wherein Naturaland Trust is the landowner and Upstate Forever is the qualified land trust holding the

3

easement. Pursuant to South Carolina's conservation easement enabling act, the holder of a conservation easement possesses a property interest in the land burdened by the easement. See S.C. Code § 27-8-20. Upstate Forever therefore holds a property interest in the affected properties owned by Naturaland Trust.

11.     The affected properties owned by Naturaland Trust were acquired through funding from the Scenic Byways Grant program of the U.S. Department of Transportation, in order to protect the viewshed and the natural resources along Highway 11. Under the federal grant requirements, the properties are protected in perpetuity by a conservation easement, held by Upstate Forever, and designed to ensure the protection of the natural resources contained on the site. This easement imposes certain obligations upon Naturaland Trust in relation to the maintenance of environmental quality on the site, including that: "there shall be no filling, excavating, dredging, draining, diking, damming, mining or drilling; … and no dumping of trash, garbage, or any other material; and no alteration of the topography of the land in any manner."

12.     This case arises from the Defendants' discharges of polluting sediment-laden stormwater from their properties for years. Nearly all of these discharges have either been deposited directly onto Naturaland Trust properties or eventually flowed onto or through those properties. Sediment has remained on Naturaland Trust properties, choking and degrading valuable water resources. Stormwater and sediment flowing through Naturaland Trust's properties empties downstream into the Eastatoe River or Little Eastatoe Creek.

13.     South Carolina Trout Unlimited ("SCTU") is our state's affiliate of Trout Unlimited, a national non-profit group organized under Section 501(c)(3) of the Internal Revenue Code and having more than 300,000 members. SCTU has been active in South Carolina for more than 40 years

4

as part of its mission is to conserve, protect and restore South Carolina's coldwater fisheries and the watersheds that support those fisheries. More specifically, the group seeks to protect, reconnect, restore and sustain trout habitat on behalf of today's anglers and coming generations of sportsmen and women who value the connection between healthy, intact habitat and angling opportunity. One of the largest threats to healthy trout habitat and population in South Carolina is sedimentation caused by human activity, and curbing this threat is a core organizational objective of SCTU.

14.    SCTU has dozens of members who utilize the waters downstream of Defendants' properties for trout fishing and other recreational opportunities. Members of SCTU were among the first to observe and report the offsite impacts caused by Defendants' unlawful discharges. Defendants' discharges of sediment-laden stormwater have diminished fishing and other recreational opportunities for SCTU members by disrupting and degrading downstream trout habitat and the ecosystem supporting trout viability. Members of SCTU have been prevented from fishing in the Eastatoe River and Little Eastatoe Creek, or have had fishing opportunities diminished, because of Defendants' unlawful acts and omissions.

15.    The organizational interests of Naturaland Trust, South Carolina Trout Unlimited, and Upstate Forever have been, are being, and will continue to be adversely affected by Defendants' unlawful sediment and stormwater discharges. The Defendants' unlawful acts and omissions have significantly diminished the natural values Naturaland Trust and Upstate Forever sought to protect when acquiring and placing an easement upon the affected properties and further threaten the duties and objectives contained in the conservation easement for those properties. These same acts and omissions strike at the heart of SCTU's organizational mission and have disrupted the individual recreational opportunities of SCTU's members. Each of the organizational Plaintiffs have standing to

5

bring this case.

16.     Defendant Dakota Finance, LLC ("Dakota") is registered owner of adjoining parcels located at 125 Buck Ridge Road, Sunset, South Carolina. Dakota owns 67 acres at this location, split between tax parcels 4154-00-03-8456 and 4154-00-14-4712. Both of these parcels have been the source of sediment and stormwater discharges forming the basis of the claims in this case.

17.     Defendant Willard R. Lamneck, Jr. is registered owner of a 5-acre parcel located at 119 Buck Ridge Road, Sunset, South Carolina, identified as tax parcel 4154-00-03-5087. Mr. Lamneck's property has been the source of sediment and stormwater discharges forming the basis of the claims in this case.

18.     Defendants Ken and Sharon Smith are the registered owners of Dakota Finance, LLC. At various times during the events giving rise to this action, the Smiths have applied for permits or engaged with the relevant regulatory agencies in their individual names and capacities. Further, Ken and Sharon Smith have personally and individually controlled the properties and activities at issue in this case, apart from any corporate enterprise.

19.     Upon information and belief, Defendants Ken and Sharon Smith are the alter egos of Dakota Finance, LLC, which is simply a corporate name given to the mixed personal and commercial activities of the Smith family.

## CLEAN WATER ACT

20.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." Id. at § 1251(a). To accomplish that objective, Congress set as a national goal that "the discharge of pollutants into the navigable waters be eliminated. . . ." Id. Accordingly, Section 301(a) of the CWA provides that the discharge of pollutants into navigable

waters of the United States is unlawful, unless the discharger complies with the Act's requirements. Id. at § 1311(a).

21.     Within the Act's requirements is Section 402, which establishes the primary permitting regime regulating pollutant discharges. Under that Section, the discharge of "pollutants" from a "point source" into "waters of the United States" is unlawful, unless such discharge is pursuant to a National Pollutant Discharge Elimination System (NPDES) permit issued by the EPA, or by a state that has received approval to issue such a permit pursuant to CWA Section 402(b). See id. §§ 1311(a), 1342(a)-(b), 1362(12)(A).

22.     The EPA administers the CWA under a cooperative federalism regime. While retaining an oversight role, the EPA can delegate administration of the CWA or portions thereof to individual states. 33 U.S.C. §1342(b). The EPA has authorized the South Carolina Department of Health and Environmental Control ("DHEC") to administer aspects of the CWA, including Section 402's NPDES permitting program. See SC Code of Regulations, R. 61-9, § 122.1(a)(1). Just like Section 402, South Carolina's regulations require "permits for the discharge of 'pollutants' from any 'point source' … into 'waters of the United States.'" Id. at § 122.1(b).

23.     The CWA defines "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure…from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

24.     Moreover, stormwater discharge from a construction site that is one acre or greater in size is regulated as a point source discharge. See 40 C.F.R. § 122.26 (describing NPDES permitting requirement for construction activities including "clearing, grading, and excavating that result in land disturbance."); SC Code of Regulations, R.72-300 et. seq.

7

25.     The CWA defines "pollutant" to include solid waste, dredged spoil, rock, and sand. 33 U.S.C. § 1362(6); 40 C.F.R. 122.2; see also United States v. Wilson, 133 F.3d 251, 259 (4th Cir. 1997) ("Dredged materials, including the native soils excavated by ditching activities, may constitute a pollutant within the meaning of the Clean Water Act.").

26.     Taken together, both under the CWA and South Carolina's implementing regulations, an NPDES permit is required for discharges of stormwater and sediment from construction sites larger than one acre. See 40 C.F.R. § 122.26(c); SC Code of Regulations R.61-9 §122.26(c).

27.     The NPDES permitting requirement for construction site stormwater discharges (the "NPDES construction permit") is intended to ensure that proper stormwater controls are in place on a construction site so that land disturbing activities can proceed in a manner protective of a community's clean water and the surrounding environment.

28.     To accomplish this objective, the NPDES construction permit program requires a permit seeker to implement and enforce a plan to reduce stormwater pollutants from the construction site. See 40 C.F.R. § 122.34(b)(4). Such plan must include erosion and sedimentation controls, site plan reviews that take account of water quality impacts, site inspections, and the implementation of erosion, sedimentation, and waste management best management practices. Id. Finally, an NPDES construction permit must include the design, implementation and maintenance of post-construction stormwater structures in order to control and improve stormwater discharges over the long-term operation of the site. Id. at § 122.34(b)(5).

29.     South Carolina's NPDES construction permit program implements these requirements by dictating that anyone engaged in clearing, grading, and/or excavating activities disturbing more

than one acre obtain an NPDES construction permit prior to beginning any land disturbing activities. Id. at § 122.26(c); S.C. Code Ann. Regs. R.72-305. Permit coverage requires submission of a Notice of Intent ("NOI") and approval of the applicant's Stormwater Pollution Prevention Plan ("SWPPP").

30.     When sediment has been unlawfully discharged from a construction site without an NPDES permit, the continued presence of that sediment in downstream waters constitutes an ongoing violation of the CWA. See, e.g., City of Mountain Park, GA v. Lakeside at Ansley, LLC, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008).

31.     In addition to regulating the discharge of sediment in stormwater from a construction site, the CWA also regulates the placement of fill material into Waters of the United States. Specifically, Section 404 of the CWA requires that a permit be obtained for the discharge of dredged or fill material into "navigable waters." 33 U.S.C. § 1344(a).

32.     In contrast to sediment that runs off of a site as a result of unmanaged stormwater, "fill material" means any material "used for the primary purpose of replacing an aquatic area with dry land or of changing the bottom elevation of a waterbody." 33 C.F.R. § 323.2(k).

33.     Discharge of fill material regulated under Section 404 includes the "[p]lacement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States" and "the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction." 33 CFR § 323.2(f).

34.     Any addition of fill material to waters of the United States without a valid Section 404 permit or an exemption constitutes a violation of the CWA. 33 U.S.C. §§1344(a)-(f). Section 404 of the CWA, Id. § 1344, authorizes the Secretary of the Army to issue permits for the discharge of dredged or fill material into "navigable waters" when certain conditions are met. All discharges of

9

dredged or fill material into waters of the United States are prohibited unless authorized under a Section 404 permit issued by the Army Corps of Engineers ("the Corps").

35.    The citizen suit provision of the CWA provides that "any citizen" may commence a suit "against any person" including a corporation "alleged to be in violation of an effluent standard or limitation under this chapter." 33 U.S.C. § 1365(a)(1).

36.    Each separate violation of the CWA subjects the violator to a sliding daily penalty that can be up to $52,414 per day for violations that occurred after November 2, 2015. See 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## ALLEGATIONS OF FACT

37.    Approximately 20 acres of the Defendants' land (the "Site"), consisting of portions of the three parcels described above, have been cleared, graded, and otherwise disturbed to facilitate construction of an event and entertainment venue along with its associated parking, septic tanks, and appurtenances. The purpose of this construction activity was to establish a commercial venue available for weddings, family reunions, dances, school field trips and parties. While this venue has been marketed by the Defendants as an event "barn" and as Arabella "Farm," these monikers merely denote the style of the event Site and not its function.

38.    The Site is bounded by three bodies of water: Clearwater Branch, Peach Orchard Branch, and an unnamed tributary of the Eastatoe River ("Unnamed Tributary"). Each of these waterbodies receives stormwater discharges from the disturbed Site during rain events, but the bulk of those discharges has been into the Unnamed Tributary. The Tributary crosses from the Site onto the property owned by Naturaland Trust property, then to property owned by the South Carolina Department of Natural Resources ("DNR"), and eventually into the Eastatoe River. The Eastatoe

10

flows to Lake Keowee a relatively short distance downstream from the Site. The Eastatoe River is a popular trout fishing waterway.

39.     Clearwater Branch, Peach Orchard Branch, and the Unnamed Tributary are continuously flowing and navigable waters of the United States, pursuant to the CWA.

40.     The unlawful discharges at issue in this case are particularly severe given the Site location. The Site is situated in an area possessing such significant ecological value that many surrounding properties have been acquired for the purpose of conservation, by both public and private entities. The ecological value of this area centers around its importance to water quality and the prevalence of valuable headwater streams and intact riverine habitats in the area. The Defendants' actions and inactions continue to cause immeasurable damage to such resources.

41.     Dakota initiated land clearing activities at the Site in early 2017. In the late spring and summer of 2017, Dakota undertook mass grading, removing all natural ground cover, denuding the entire Site, and exposing its underlying granular soil. The Site's steep terrain and sandy soil make it inherently incompatible with the type of aggressive land disturbance undertaken by the Defendants, and Defendants' activities have made the site exceedingly difficult to stabilize and susceptible to major erosion.

42.     Making matters worse, Defendants claimed to be exempt from the laws meant to prevent and manage that erosion. For years after commencing work on the Site, Defendants maintained that their project fell within an "agricultural exemption" to CWA stormwater permitting and regulation. To preserve this claim, Defendants went so far as to represent in various official documents that the "barn" at Arabella Farm was purely for agriculture and would not have a septic system or other indicia of the structure's true commercial purpose.

11

43.     Because Defendants claimed to be exempt from CWA stormwater regulation, their land clearing and grading took place without even the most basic stormwater structures (called Best Management Practices or "BMPs") in place. Consequently, significant unlawful discharges of sediment-laden stormwater began immediately and continue to occur with every rain event.

44.     Construction of the physical event space (the "barn") was completed by at least January 2018. No BMPs were in place during construction of this facility, and erosion was significant and widespread, especially onto Naturaland Trust property.

45.     These problems eventually led to the involvement of Pickens County, the entity with primary authority over regulation of land disturbance at the Site.[1] Pickens County began monitoring the Site in 2018, and representatives of Pickens County have intermittently visited or inspected the Site more than a dozen times since then.  The County has well-documented major erosion and stormwater impacts during these visits.

46.     Based on the intervention of Pickens County, Defendants finally applied for an NPDES construction permit on May 9, 2018. However, this permit application minimized and misrepresented the Defendants' project. The application states that the Defendants "*intend to construct* a barn/pavilion structure to accommodate special events," and the start date for land disturbance is listed at May 15, 2018. Of course, in actuality, mass grading had long since taken place on the Site, and the event barn was fully constructed prior to this application. Further, in a flagrant misrepresentation of the 20 or so acres of major land moving that had already taken place on the Site, Defendants' application reported the planned disturbance as a mere 2.2 acres.

---

[1] NPDES stormwater permits are issued at the state level, as explained above, but Pickens County also has authority and responsibility to regulate land disturbance and stormwater in the County, pursuant to the Clean Water Act's "MS4" program.

47.    Pickens County promptly denied Dakota's application based on twenty-one separate deficiencies, including the misrepresented size of the project. Dakota subsequently reapplied with Pickens County twice more, on June 29, 2018 and January 8, 2019, but many deficiencies in Dakota's proposed stormwater plan were noted each time, and Dakota never obtained an NPDES construction permit for its discharges.

48.    By late 2018, the Defendants began to install limited stormwater BMPs on the Site, but these installations were patchwork, poorly designed, insufficient, unmaintained, and not part of an approved Stormwater Pollution Prevention Plan ("SWPPP"), which is required for NPDES permit coverage. One component of this patchwork system was a makeshift dam erected by the Defendants in the Unnamed Tributary, on the boundary of Naturaland Trust property. This dam consists of logs, branches, miscellaneous debris, rock and soil. The dam fully blocks the streambed and is meant to impede the mass transport of sediment downstream.  Debris from this makeshift dam has fallen into the Unnamed Tributary on Naturaland Trust property.

49.    Defendants sought no permit or approval for construction of this dam, and the Army Corps of Engineers, who regulates such fill activities under CWA Section 404, had to be alerted to the dam by DNR.

50.    Also in late 2018, major downstream impacts from the Site were first noticed on the Eastatoe River. The Unnamed Tributary discharges into the Eastatoe in close proximity to a major public fishing access point for what is likely the most heavily utilized trout fishing area in the state. Trout fishermen in the Eastatoe, including members of SCTU with specialized training to recognize sedimentation and siltation, began to notice plumes of sediment emanating from the Unnamed Tributary, as well as a massive sand bank building up at the point where the Tributary meets the

13

Eastatoe.

51.    Trout populations, and thereby opportunities for trout fishing, are limited to a small number of high-quality water bodies in South Carolina. Trout populations cannot coexist with the type of sediment-laden stormwater discharges that have originated from the Site, as such discharges cause detrimental impacts to dissolved oxygen levels, water temperature, and critical food sources, including macroinvertebrate populations.

52.    During significant rain events in 2018 and 2019, sediment discharges from the Site reached the Eastatoe with a volume and frequency that were significantly disruptive to the ecology and water quality of the River and to the recreational opportunities of those attempting to use the River.

53.    Fishermen complaints in late 2018 triggered oversight from DNR. Documentation reflects that, for at least two years, staff at DNR have been working in vain to stop sedimentation from the Site from entering the valuable trout waters of the Eastatoe River. These efforts have included dozens of communications with Pickens County, DHEC, the Corps, and the Department of Transportation. For instance, on January 2, 2019, DNR's manager for the region expressed to Pickens County that the Unnamed Tributary had been "irreparably harmed" and that "[t]he Eastatoe River has been equally devastated."

54.    Ultimately, DNR's legal office served Defendants with a "cease and desist" letter on January 29, 2019, ordering Defendants to immediately stabilize the Site, stop work, prevent further offsite impacts, or be sued.

55.    DNR's cease and desist letter is but one of many such letters that Defendants received during 2018 and 2019. The full list, at least as far as Plaintiffs have seen so far, includes: the DNR

14

letter, two stop-work orders and an enforcement agreement from Pickens County, and two stop-work orders from DHEC. Defendants' response to the directives in these stop-work letters has ranged from total noncompliance to, at most, partial compliance. Many of the core directives in these letters—including that Defendants obtain an NPDES construction permit and that Defendants assess the nature and extent of downstream impacts–remain unsatisfied today.

56.    Defendants' troubling history of ignoring serious regulatory agency directives is apparent in quotes like the following from Pickens County on January 3, 2019: "Pickens County Stormwater staff made contact on December 20, 2018, and made you aware of the offsite impacts and requested immediate action. As of today, no efforts have been made to stabilize or control sediment from discharging from your property."

57.    In sum, sediment-laden stormwater discharges into Clearwater Branch, Peach Orchard Branch, and the Unnamed Tributary have been consistent and significant during rain events since the outset of Defendants' Site disturbance through the present. By at least December 2018, and likely for many months before, these unlawful discharges had accumulated downstream at levels damaging property and ecology and interfering with public recreation. These impacts continue today.

58.    The stormwater failures on the Site, and the resulting consequences downstream, are well documented through recurring site inspections, and citizen and agency reports spanning years. Throughout these reports are interspersed a number of major rain events, during which catastrophic and shocking downstream impacts have been observed and documented.

59.    The well-documented history of this Site reflects an extraordinary length of time during which the Site lacked adequate stabilization or stormwater protections, creating hundreds of individual discharges of sediment and stormwater into Waters of the United States and onto property

owned by Naturaland Trust and in which Upstate Forever holds an easement.

### FOR A FIRST CAUSE OF ACTION
**(Clean Water Act, 33 USC § 1342 – Unpermitted Discharges from Construction Site)**

60.    Every allegation is incorporated as if set forth verbatim.

61.    Construction and operation of the Site have resulted in recurring unlawful discharges of sediment-laden stormwater and other pollutants into waters of the United States, in violation of the CWA.

62.    Defendants controlled, performed, or are otherwise responsible for previous and ongoing discharges of pollutants from the Site, in the form of sediment, stormwater, and other dirt, rock, and sand.

63.    During any significant rainfall event since land clearing began on the Site in 2017, these pollutants previously were and presently are discharged from the disturbed construction Site and/or discrete conveyances on the Site, including pipes, ditches, surface impoundments and other similar conveyances used to collect and funnel stormwater. Each of these conveyances and the Site itself are point sources pursuant to the Clean Water Act. 33 USC § 1362(14).

64.    Discharges of pollutants from the site previously were and presently are flowing directly into Clearwater Branch, Peach Orchard Branch, and the Unnamed Tributary of the Eastatoe River, each of which are "waters of the United States" under the CWA. See 33 USC § 1362(7).

65.    Defendants' ongoing discharges of pollutants have not been permitted by competent governmental authority. Defendants did not and do not have an NPDES permit for their discharges.

66.    As a consequence of previous unlawful discharges from the Site, downstream impacts have been extensive and continue to accrue. The continued presence of unlawfully discharged

sediment in jurisdictional waters downstream of the Site constitutes an ongoing violation of the CWA.

67.    Plaintiffs are entitled to an injunction requiring Defendants to obtain and implement an NPDES construction permit under the CWA.

68.    Plaintiffs are entitled to an injunction requiring Defendants to stop the flow of stormwater and runoff from the Site into the waterways that flow through Naturaland Trust property and onto Naturaland Trust property.

69.    Plaintiffs are further entitled to an injunction requiring Defendants to remove and remediate the makeshift dam placed within the Unnamed Tributary, as this attempted stormwater BMP was installed without a NPDES construction permit.

70.    Plaintiffs are further entitled to an injunction requiring Defendants to remove all previously discharged sediment from downstream waterbodies, including the streams on Naturaland Trust property.

71.    Plaintiffs are further entitled to imposition of a fine against Defendants for each violation of the CWA since 2017, in the amount of $52,414 per day of violation.

72.    Finally, Plaintiffs are entitled to compensation for their attorneys' fees, expert witness fees, and costs and expenses accrued in bringing and pursuing this action.

**FOR A SECOND CAUSE OF ACTION**
**(Clean Water Act, 33 U.S.C. § 1344(c) – Placement of Fill Material Without Valid Permit)**

73.    Every allegation is incorporated as if set forth verbatim.

74.    Defendants controlled, performed, or are otherwise responsible for the ongoing discharge of fill material, in the form of logs, branches, miscellaneous debris, rock and soil, into the

Unnamed Tributary, a navigable water of the United States. The purpose of this discharge was to create a makeshift dam on the Unnamed Tributary in order to strain sediment discharges and to create a stormwater impoundment.

75.     Defendants did not request nor receive a permit under Section 404 of the CWA before undertaking such discharge.  After the fact, the Corps informed Defendants that their discharge of fill into the Unnamed Tributary is authorized under Nationwide Permit ("NWP") #18, which covers "minor discharges," so long as Defendants' fill activities meet all the conditions of that NWP.

76.     Defendants' discharge of fill material does not meet the conditions for coverage under NWP #18. Upon information and belief, Defendants cannot meet the three conditions required for coverage under NWP #18, which are: that the quantity of discharged material does not exceed 25 cubic yards; that the discharge does not cause the loss of more than 1/10 acre of waters of the United States; and that the discharge is not placed for purpose of stream diversion.

77.     Further, the Corps has established a list of General Conditions, which a prospective permittee must meet in order to qualify for any NWP authorization. Defendants' discharge of fill does not meet several of these conditions, including conditions related to design and maintenance of the makeshift dam and its impact on ecology and waterflow.

78.     Upon information and belief, the Corps failed to apprehend that Defendants' discharge of fill does not meet the conditions required by NWP #18, because of incorrect or inadequate information provided in Defendants' NWP submittal.

79.     Defendants' discharge of fill material does not qualify for NWP #18, and Defendants therefore have violated the CWA by undertaking such discharge without a permit.

80.    Consequently, Plaintiffs are entitled to an injunction requiring Defendants to remove and remediate the makeshift dam placed within the Unnamed Tributary.

81.    Plaintiffs are further entitled to imposition of a fine against Defendants for each violation of the CWA since the dam was unlawfully constructed, in the amount of $52,414 per day of violation.

82.    Finally, Plaintiffs are entitled to compensation for their attorneys' fees and costs accrued in bringing this action.

## **FOR A THIRD CAUSE OF ACTION**
**(Clean Water Act, 33 U.S.C. § 1344(c) – Placement of Fill Material in Violation of Permit)**

83.    Every allegation is incorporated as if set forth verbatim.

84.    To the extent Defendants possess a permit under Section 404 of the CWA, Defendants' discharge of fill material into the Unnamed Tributary is in violation of the terms of that permit.

85.    Defendants' discharge of fill is contrary to the terms of NWP #18 in the particulars described above.

86.    Defendants therefore have violated the CWA by undertaking fill activities in a manner contrary to the terms of their permit authorization under the Act.

87.    Consequently, Plaintiffs are entitled to an injunction requiring Defendants to remove and remediate the makeshift dam placed within the Unnamed Tributary.

88.    Plaintiffs are further entitled to imposition of a fine against Defendants for each violation of the CWA since the dam was unlawfully constructed, in the amount of $52,414 per day of violation.

89.     Finally, Plaintiffs are entitled to compensation for their attorneys' fees and costs accrued in bringing this action.

## FOR A FOURTH CAUSE OF ACTION
### (Private Nuisance)
### (by Plaintiffs Naturaland Trust and Upstate Forever)

90.     Every allegation is incorporated as if set forth verbatim.

91.     Both Naturaland Trust and Upstate Forever possess a property interest in the affected properties.

92.     Defendants' sediment-laden stormwater discharges from the Site constitute a substantial and unreasonable interference with Plaintiffs' use and enjoyment of the affected properties.

93.     Defendants' actions have decimated the ecological value of water resources on the affected properties, and that ecological value is a large part of the reason why those properties were purchased. The organizational mission of the Plaintiffs in relation to these properties previously was and presently is threatened. The harm created by Defendants' actions has indeed jeopardized the terms under which Naturaland Trust's purchase of these properties was funded and the easement on these properties negotiated.

94.     Further, recreational and educational opportunities on the affected properties continue to be diminished as a consequence of Defendants' improper and unlawful stormwater discharges.

95.     Defendants knew or should have known of the existence of the nuisance created by their actions, but Defendants have taken no steps to abate the harms suffered by Plaintiffs.

96.     Plaintiffs have suffered damages as the proximate result of Defendants' improper and unlawful management of stormwater discharges from the Site.

97.     Defendants' mismanagement of sediment-laden stormwater, as described herein, constitutes a past, present and ongoing private nuisance.

98.     Plaintiffs are entitled to recover actual damages as a result of the private nuisance caused by Defendants.

99.     Plaintiffs are further entitled to an injunction requiring Defendants to eliminate the conditions creating the private nuisance, to include: stopping the flow of stormwater and sediment through and onto Naturaland Trust property; removing and remediating the makeshift dam placed within the Unnamed Tributary; and removing all previously discharged sediment on Naturaland Trust property.

100.    Plaintiffs are further entitled to punitive damages as a result of Defendants' past, present and continuing willful, wanton and reckless disregard for the rights of the organizations.


**FOR A FIFTH CAUSE OF ACTION**
**(Public Nuisance)**
**(by Plaintiffs Naturaland Trust and Upstate Forever)**

101.    Every allegation is incorporated as if set forth verbatim.

102.    Defendants, by their unlawful acts and omissions alleged herein, have obstructed the exercise of a common and public right, in that Defendants have diminished water quality, wildlife, and recreational opportunities, affecting the public interest in waterways including the Eastatoe River, Little Eastatoe Creek, Lake Keowee, and their tributaries.

103.    Defendants, by their unlawful acts and omissions alleged herein, have annoyed, injured, endangered, rendered insecure, and interfered with the rights of public property enjoyed by

the surrounding community and the considerable number of persons who utilize the affected water resources.

104.    Plaintiffs have suffered special injury as a result of Defendants' substantial and unreasonable interference with the public right, in that Plaintiffs have suffered injury to their private property interests and property value. The harm suffered by Plaintiffs is different in kind and degree from that suffered by the public. Plaintiffs have standing to maintain this public nuisance claim.

105.    Defendants' mismanagement of sediment-laden stormwater, as described herein, constitutes a past, present and ongoing public nuisance.

106.    Plaintiffs are entitled to recover actual damages as a result of the public nuisance caused by Defendants.

107.    Plaintiffs are further entitled to an injunction requiring Defendants to eliminate the conditions creating the public nuisance, to include: stopping the flow of stormwater and sediment into public waterways; removing and remediating the makeshift dam placed within the Unnamed Tributary; and removing all previously discharged sediment within public waterways.

<u>FOR A SIXTH CAUSE OF ACTION</u>
**(Trespass and Continuing Trespass)**
**(by Plaintiffs Naturaland Trust and Upstate Forever)**

108.    Every allegation is incorporated as if set forth verbatim.

109.    By allowing, enabling, and encouraging improperly controlled stormwater, laden with soil and sediment, to be discharged onto Plaintiffs' properties, Defendants have caused harmful material to enter and occupy the affected properties.

110.    Plaintiffs did not give permission for the entry of this sediment and other material, and Plaintiffs have in fact actively and vigorously opposed Defendants' unlawful discharges.

22

111.    Defendants' actions constitute a trespass and continuing trespass by entry of stormwater, sediment, and other runoff onto property in which both Plaintiffs hold a property interest.

112.    Defendants knew or should have known that failing to responsibly manage their stormwater discharges in close proximity to Plaintiffs' properties would, to a substantial certainty, result in the unlawful entry of sediment-laden stormwater onto those properties.

113.    Further, Defendants have known of the existence of these trespasses for years but have taken no or inadequate steps to abate the flow of sediment-laden stormwater onto the affected properties.

114.    As a direct and proximate result of the aforementioned trespass by the Defendants, the Plaintiffs have been denied the benefit and use of their properties and Plaintiffs' properties have been devalued and damaged.

115.    Plaintiffs are entitled to judgment against the Defendants for actual and punitive damages and for an appropriate injunction ordering that the continuing trespass cease.

116.    Through their trespass and continuing trespass, Defendants have acted and continue to act willfully, wantonly, and in reckless disregard for Plaintiffs' rights, entitling Plaintiffs to the recovery of punitive damages.

<u>**FOR A SEVENTH CAUSE OF ACTION**</u>
**(Negligence/Gross Negligence)**
**(by Plaintiffs Naturaland Trust and Upstate Forever)**

117.    Every allegation is incorporated as if set forth verbatim.

118.    Defendants undertook, owned, controlled, operated and managed unpermitted and improper land disturbance activities, and Defendants failed to install a stormwater system adequate to prevent or manage the significant erosion and runoff resulting therefrom.

119.    The reasonably foreseeable outcome of Defendants' acts and omissions was injury to the Plaintiffs.  Defendants knew or should have known that their acts and omissions were certain to cause sediment-laden stormwater to reach Plaintiffs' property, causing harm to Plaintiffs.

120.    Defendants owed Plaintiffs a reasonable duty of care to ensure that their land disturbance activities and stormwater would not cause harmful sedimentation and other damage to Plaintiffs' property.

121.    Defendants breached their duties to Plaintiffs in a manner that was negligent, careless, reckless, willful, and wanton in the following particulars:

a.    Defendants by their acts and omissions, individually and collectively, breached a duty to Plaintiffs by discharging sediment and polluted water onto the surrounding land, including Naturaland Trust property, during their unpermitted and illegal land disturbance activities.

b.    Defendants by their acts and omissions, individually and collectively, breached a duty to Plaintiffs by failing to prevent and adequately remedy the flow of sediment-laden stormwater onto Plaintiffs' land and by channeling that stormwater onto Plaintiffs' land through a dam, pipes, ditches, surface impoundments and other similar conveyances used to collect and funnel stormwater.

c.    Defendants by their acts and omissions, individually and collectively, breached a duty to Plaintiffs by failing to disclose to local, state and Federal regulatory agencies, truthful information concerning the existence and nature of their construction and commercial activities, and their fill and polluted stormwater discharge onto surrounding property, including Plaintiffs' property.

d.    Defendants by their acts and omissions, individually and collectively, breached a duty to Plaintiffs by illegally and improperly undertaking their design, construction, grading and sitework activities adjacent to Plaintiffs' property, resulting in fill and uncontrolled flow of polluted water onto Plaintiffs' property.

24

e.  Defendants by their acts and omissions, individually and collectively, breached a duty to Plaintiffs by failing to design, engineer, construct, maintain and implement BMPs to prevent the surface flow of polluted stormwater onto surrounding property, including Plaintiffs' property.

f.  Defendants by their acts and omissions, individually and collectively, breached their duty to Plaintiffs by failing to notify, warn or otherwise disclose to Plaintiffs the existence of their improper land disturbing activities and inadequate stormwater system and by failing to act to rectify such inadequacies.

122.  Defendants had adequate notice and opportunity to address each of the aforementioned breaches and to prevent further damage to Plaintiffs' property, but Defendants failed to take corrective action for a period of years.

123.  As a direct and proximate result of the negligent acts and omissions of Defendants, Plaintiffs have been damaged in that their property has been harmed by the intrusion of sediment, fill and polluted water, and their intended uses of the property have been diminished.

124.  Plaintiffs are entitled to recover actual damages to compensate for the harm caused by Defendants' negligence.

125.  Through their negligence and gross negligence, Defendants have acted and continue to act willfully, wantonly, and in reckless disregard for Plaintiffs' rights, entitling Plaintiffs to the recovery of punitive damages.

## FOR AN EIGHTH CAUSE OF ACTION
### (Negligence Per Se)
### (by Plaintiffs Naturaland Trust and Upstate Forever)

126.  Every allegation is incorporated as if set forth verbatim.

127.  Plaintiffs' properties were and are entitled to protection from Defendants' acts and omissions alleged herein, pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342; the

South Carolina Stormwater Management Sediment Reduction Act, S.C. Code Ann. §§ 48-14-10 through 48-14-170; and the state Stormwater regulations, SC Code of Regulations, R.72-300 et. seq.

128.     Each of these authorities requires an NPDES permit for discharges of stormwater and sediment from construction sites larger than one acre. These authorities also impose various requirements to limit the impact of erosion and sedimentation from stormwater. The essential purpose of the statutes and regulations is to protect the environment from harm caused by stormwater as a result of improperly conducted and unpermitted land disturbance activities.

129.     In conducting unpermitted and improperly managed land disturbance activities, which have caused unpermitted and illegal stormwater discharges, Defendants violated these authorities.

130.     The purpose of both the federal and state stormwater permitting requirements is the protection of land and water resources and the welfare of the people. See 33 U.S.C. § 1251(b) (stating that the objective of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's water"); see also 1991 S.C. Act. No. 51, § 1(A)(2) ("The General Assembly finds...that the management of stormwater runoff and sediment is necessary to reduce pollution, siltation, sedimentation, local flooding, and stream channel erosion, all of which impact adversely on the land and water resources and the health, safety, and welfare of the people of this State").

131.     As such, there can be no doubt that the "essential purpose" of both the federal and state stormwater permitting statutes is protection from the kind of harm which the Plaintiffs have suffered at the hands of the Defendants. Plaintiffs are clearly among the class of persons whom these statutes seek to protect.

132.    As a result of Defendants' violations of the statutes and regulations, Plaintiffs have suffered damages and are entitled to recover from Defendants.

133.    Through their negligence, Defendants have acted and continue to act willfully, wantonly, and in reckless disregard for Plaintiffs' rights in their violation of this statute and ordinance, and Plaintiffs are entitled to recover punitive damages from Defendants.

WHEREFORE, having fully set forth their allegations against Defendants, Plaintiffs respectfully request the following relief:

(1) Injunctive relief under the CWA;

(2) Fines and penalties for past and current violations of the CWA, payable to the United States Treasury;

(3) Attorneys' fees and costs of litigation;

(4) Actual damages, including incidental and consequential damages, in an amount to be determined by a jury;

(5) Punitive damages in an amount to be determined by a jury intended to punish the Defendants for their willful, wanton and reckless conduct, and to deter them from acting in such a manner to harm Plaintiffs and others;

(6) Injunctive relief requiring the complete removal of all sediment, debris and other pollutants discharged by Defendants onto Plaintiffs' property and the complete restoration of such property;

(7) For such other relief as the court may deem just and proper.

Respectfully submitted,

s/Michael Corley
Michael Corley, Esq. (Fed ID# 10590)
Lauren Megill Milton, Esq. (Fed ID# 12272)
SOUTH CAROLINA ENVIRONMENTAL LAW PROJECT
Physical: 430 Highmarket St. | Georgetown, SC 29440
Mailing: P.O. Box 1380 | Pawleys Island, SC 29585
Tel: (843) 527-0078 | Fax: (843) 527-0540

***Attorneys for the Plaintiffs***

Greenville, South Carolina
April 6, 2020